**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 15, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RICHARD GEORGE; STEVEN
LEAVITT; SANDRA LEAVITT;
DARRELL DALTON, and all others
similarly situated,

     Plaintiffs - Appellants,

v.                                                                          No. 14-1427

URBAN SETTLEMENT SERVICES,
d/b/a Urban Lending Solutions; BANK OF
AMERICA, N.A.,

     Defendants - Appellees.

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:13-CV-01819-PAB-KLM)**
_____

Kevin K. Green (Steve W. Berman, on the briefs), Hagens Berman Sobol Shapiro, LLP,
Seattle, Washington, for Darrell Dalton, Richard George, and Sandra Leavitt, and Steven
Leavitt, Plaintiffs-Appellants.

Keith Levenberg, Goodwin Procter LLP, Washington, D.C. (James W. McGarry,
Goodwin Procter LLP, Boston, Massachusetts, Peter Korneffel, Bryan Cave, LLP,
Denver, Colorado, with him on the brief), for Bank of America, N.A., Defendant-
Appellee.

Martin C. Bryce, Ballard Spahr, LLP, Philidelphia, Pennsylvania (Sarah B. Wallace,
Ballard Spahr, LLP, Denver, Colorado, with him on the brief), for Urban Settlement
Services, Defendant-Appellee.

_____

Before **BRISCOE**, **HOLMES**, and **MORITZ**, Circuit Judges.

———————————————————

**MORITZ**, Circuit Judge.

———————————————————

Richard George, Steven Leavitt, Sandra Leavitt, and Darrell Dalton appeal the district court's dismissal of their putative class action against Urban Settlement Services, d/b/a Urban Lending Solutions (Urban) and Bank of America, N.A. (BOA). The plaintiffs asserted a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, against BOA and Urban. They also brought a promissory estoppel claim against BOA. Both claims arose from the defendants' allegedly fraudulent administration of the Home Affordable Modification Program (HAMP). The district court granted the defendants' Fed. R. Civ. P. 12(b)(6) motions to dismiss both claims, denied the plaintiffs' request for leave to amend their first amended complaint, and dismissed the case.

Because we conclude that the plaintiffs' first amended complaint states a facially plausible RICO claim against BOA and Urban and a facially plausible promissory estoppel claim against BOA, we reverse and remand for further proceedings. Our reversal moots the plaintiffs' challenge to the district court's denial of their request to further amend the complaint.

### BACKGROUND

When Congress enacted the Emergency Economic Stabilization Act of 2008, it authorized the Secretary of the U.S. Department of the Treasury to establish the Troubled Asset Relief Program (TARP) and to purchase troubled assets, including

2

certain residential mortgages, from financial institutions. *See generally* 12 U.S.C. §§ 5201, 5202, 5211. Consistent with this authority, the Secretary established HAMP in 2009 to encourage mortgage servicers to modify loan terms for delinquent borrowers at risk of foreclosure.

As a condition of receiving TARP funds, BOA was required to participate in HAMP and to comply with the program guidelines. These guidelines required BOA to collect financial information from at-risk borrowers; evaluate borrowers' eligibility for HAMP loan modifications; place eligible borrowers on Trial Period Plans (TPPs) so they could demonstrate their ability to make lower monthly payments; and permanently modify loans for qualified borrowers who complied with their individual TPPs.

BOA contracted with various third parties, including Urban, to implement and administer HAMP. Urban is a "mortgage solutions provider" that "provides numerous clients a variety of services, including mortgage fulfillment services, home retention solutions, appraisals and valuation services, title and settlement services, and call center services." App. 170.

The four plaintiffs in this action each had a home mortgage through BOA, each applied for a HAMP loan modification, and each interacted with BOA and Urban representatives during the application process. In July 2013, the plaintiffs filed a putative class action against BOA and Urban, asserting a RICO claim against both and a promissory estoppel claim against BOA. In accordance with local rules, the plaintiffs conferred with the defendants about the claims and about the defendants'

3

anticipated motions to dismiss. The plaintiffs amended their complaint in August 2013 to correct deficiencies the defendants identified.

To support their RICO claim, the plaintiffs alleged the defendants and various other entities formed a RICO enterprise with the common goal of wrongfully denying HAMP loan modifications to qualified homeowners. According to the plaintiffs, BOA and Urban developed a scheme to obstruct and delay borrowers' HAMP loan modification requests. The defendants furthered that scheme by denying they had received application documents they had in fact received and by misleading borrowers about the status of their applications. The plaintiffs alleged damages including longer loan payoff times, increased principal and interest on their loans, damage to credit reports, and inappropriately charged processing and late fees associated with delinquency and default.

The plaintiffs also asserted a promissory estoppel claim against BOA. They alleged that BOA made clear promises—both in TPP documents and on its website—to provide permanent loan modifications to qualified borrowers who successfully completed TPPs. And they alleged that BOA reneged on those promises.

BOA and Urban filed separate Rule 12(b)(6) motions to dismiss the plaintiffs' claims. In moving to dismiss the RICO claim, BOA argued the plaintiffs failed to plausibly allege the existence of an enterprise sufficiently distinct from BOA. Urban, on the other hand, argued the plaintiffs failed to sufficiently allege Urban participated in the conduct of the enterprise. And both defendants argued the plaintiffs failed to plausibly allege a pattern of racketeering activity.

4

The district court granted both motions, concluding the plaintiffs failed to plausibly allege (1) Urban's participation in the conduct of the enterprise and (2) the existence of an enterprise separate and distinct from BOA and its agents.[1] The court denied the plaintiffs' request to amend their first amended complaint and dismissed the case. The plaintiffs appeal.

## DISCUSSION

We review a Rule 12(b)(6) dismissal de novo. *Childs v. Miller*, 713 F.3d 1262, 1264 (10th Cir. 2013). We accept a plaintiff's well-pleaded factual allegations as true and determine whether the plaintiff has provided "enough facts to state a claim to relief that is plausible on its face." *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In determining the plausibility of a claim, we look to the elements of the particular cause of action, keeping in mind that the Rule 12(b)(6) standard doesn't require a plaintiff to "set forth a prima facie case for each element." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192-93 (10th Cir. 2012). *See also Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (noting that "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context"). Rather, a claim is facially plausible if the plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[1] The district court didn't address the defendants' arguments that the plaintiffs failed to sufficiently plead a pattern of racketeering activity.

alleged." *Hogan*, 762 F.3d at 1104 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## I.     The district court erred in dismissing the plaintiffs' RICO claim.

The plaintiffs argue that the factual allegations in their first amended complaint state a facially plausible RICO claim against both BOA and Urban and that the district court therefore erred in dismissing that claim.

"RICO provides a private right of action in federal court for individuals injured in their business or property through fraudulent conduct." *Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1274 (10th Cir. 2014). *See* 18 U.S.C. § 1964(c) (providing private right of action and treble damages for § 1962(c) violations). The plaintiffs assert that BOA and Urban violated § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." The plaintiffs identify both BOA and Urban as RICO "persons."[2]

Thus, to avoid dismissal, the plaintiffs must plausibly allege that BOA and Urban each (1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of

---

[2] Neither BOA nor Urban disputes that it is a "person" for RICO purposes. *See* 18 U.S.C § 1961(3) (defining "person" to "include[] any individual or entity capable of holding a legal or beneficial interest in property").

6

racketeering activity. *See* 18 U.S.C. § 1962(c); *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002).

### A. The plaintiffs sufficiently allege the existence of a RICO enterprise that is distinct from BOA.

The plaintiffs characterize the district court's conclusion that the alleged enterprise was insufficiently distinct from BOA as contrary to legal precedent and public policy. The plaintiffs argue that because they alleged an association-in-fact enterprise consisting of numerous independently owned and operated companies, the alleged enterprise is sufficiently distinct from BOA.

BOA, on the other hand, argues the district court properly concluded that the plaintiffs failed to plead a sufficiently distinct enterprise because (1) the alleged enterprise consists solely of BOA's own employees and agents and (2) the plaintiffs don't allege that the enterprise conducted any affairs other than BOA's own.

RICO broadly defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The plaintiffs rely on the latter part of this definition, alleging that BOA, Urban, and others formed an association-in-fact enterprise. *See Boyle v. United States*, 556 U.S. 938, 946 (2009) (explaining that an association-in-fact enterprise has "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose").

7

The plaintiffs allege the enterprise's common purpose in this case was "to extend as few permanent HAMP modifications as possible while providing BOA a justification to claim that borrowers had not fulfilled their [TPPs] or were otherwise ineligible for HAMP modifications." App. 156. According to the plaintiffs, BOA and Urban maintained the key relationship among the numerous entities associated with the enterprise.[3] BOA contracted with Urban "to provide HAMP-related ministerial services," App. 108, and delegated several tasks to Urban. And while the plaintiffs allege that BOA directed Urban's HAMP-related activities, they further assert that Urban exercised broad discretion to manage and operate its portion of the enterprise. Finally, in pleading longevity, the plaintiffs allege BOA and Urban began conducting the affairs of the enterprise in 2009 and continued to do so in 2013 when the plaintiffs filed their complaint.

The district court concluded the plaintiffs failed to allege that BOA is sufficiently distinct from that association-in-fact enterprise. In reaching that conclusion, the court first found that BOA, its subsidiary BAC Home Loans, and BOA's employees couldn't form a RICO enterprise because they have a parent corporation-subsidiary relationship. Next, the court determined that Urban and its

---

[3] The plaintiffs allege several other entities associated with the alleged enterprise including BOA's subsidiary, BAC Home Loans Servicing, LP; certain named BOA and Urban officers and employees; Sykes Enterprises, Inc. and Wingspan Portfolio Advisors, two entities that BOA retained to communicate with customers seeking loan modifications and to process applications; two law firms BOA used to facilitate home foreclosures after BOA allegedly wrongfully denied loan modifications; and Stewart Lender Services, an entity BOA retained to process documents mailed to and received from homeowners.

employees were BOA's agents, who did nothing more than follow BOA's instructions. Similarly, the court found that the other alleged members of the enterprise were merely BOA's agents and that BOA retained them to conduct BOA's affairs rather than the enterprise's.

We disagree. We recognize that § 1962(c) requires that the "person" conducting the enterprise's affairs be distinct from the "enterprise." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 160 (2001); *see Bd. of Cty. Comm'rs of San Juan Cty. v. Liberty Grp.*, 965 F.2d 879, 885 & n.4 (10th Cir. 1992) (collecting cases and noting predominant view that § 1962(c) "require[s] that the 'person' and the 'enterprise' engaged in racketeering activities be different entities"). And we further recognize that a plaintiff must demonstrate that the defendant conducted the affairs of the enterprise rather than simply conducting the defendant's own affairs. *Brannon v. Boatmen's First Nat. Bank of Okla.*, 153 F.3d 1144, 1146 (10th Cir. 1998).

Finally, it's true that a defendant corporation, acting through its subsidiaries, agents, or employees typically can't be both the RICO "person" and the RICO "enterprise." *See Brannon*, 153 F.3d at 1149 (collecting cases); *Bd. of Cty. Comm'rs of San Juan Cty.*, 965 F.2d at 886 ("[O]fficers and employees of an organization cannot, in the ordinary course of their duties, constitute an association in fact separate from the organization itself."). *See also In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 493 (6th Cir. 2013) (noting that a parent corporation and its subsidiaries don't ordinarily satisfy the distinctness requirement); *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226-28 (7th Cir. 1997) (concluding that because "an

9

employer and its employees cannot constitute a RICO enterprise," a "manufacturer plus its dealers and other agents (or any subset of the members of the corporate family) do not constitute" a RICO enterprise).

Here, the district court relied on *Brannon* and *Fitzgerald* to conclude that BOA wasn't sufficiently distinct from the enterprise. But our review of those cases reveals that neither supports the district court's conclusion. In *Brannon*, the plaintiffs alleged in two separate counts that (1) a bank holding company was the RICO enterprise and the holding company's subsidiary was the RICO person conducting the enterprise's affairs; and conversely that (2) the holding company's subsidiary was the RICO enterprise and the holding company was the RICO person conducting the enterprise's affairs. 153 F.3d at 1145-46. Similarly, in *Fitzgerald*, the plaintiffs alleged that the Chrysler Corporation was a RICO person conducting the affairs of an enterprise composed of Chrysler's subsidiaries, Chrysler's independent automobile dealers, and various trusts controlled by Chrysler. 116 F.3d at 226.

Focusing primarily on the parent-subsidiary relationship, this court in *Brannon* and the Seventh Circuit in *Fitzgerald* concluded that the plaintiffs in those cases failed to allege RICO enterprises sufficiently distinct from the RICO persons and therefore affirmed the district courts' Rule 12(b)(6) dismissals of the plaintiffs' RICO claims. *See Brannon*, 153 F.3d at 1145-49 (holding that "a parent-subsidiary corporate relationship standing alone" is not sufficient to "invoke RICO liability"); *Fitzgerald*, 116 F.3d at 226-28 (holding that a "manufacturer plus its dealers and

10

other agents, (or any subset of the members of the corporate family), do not constitute an enterprise within the meaning of [RICO]").

In contrast, the plaintiffs here allege an association-in-fact enterprise. They don't contend that either a parent corporation or its subsidiary corporation is the enterprise. Rather, they assert that BOA and Urban—two separate legal entities— joined together, along with several other entities, to form and conduct the affairs of the BOA-Urban association-in-fact enterprise. The plaintiffs further allege that BOA conducted the enterprise's affairs, rather than BOA's own affairs, by acting in concert with Urban and other members of the enterprise to implement and execute a scheme to fraudulently deny HAMP loan modifications to qualified borrowers.

Moreover, BOA's act of contracting with Urban to provide HAMP-related services didn't somehow render Urban a BOA subsidiary, a BOA agent, or even part of the BOA corporate family. Instead, the plaintiffs assert that BOA and Urban remained separate legal entities in distinct lines of business. Specifically, BOA is a mortgage lender whose services extend well beyond participation in HAMP, while Urban is a limited liability corporation that provides mortgage-related services to numerous clients, including BOA. Further, the plaintiffs allege that each entity performed distinct roles within the enterprise while acting in concert with other entities to further the enterprise's common goal of wrongfully denying HAMP applications.

Additionally, the plaintiffs suggest that the relationship between BOA and Urban enhanced the enterprise's ability to thrive and avoid detection. For instance,

11

according to the plaintiffs, BOA publicly represented its compliance with HAMP guidelines while simultaneously implementing and enforcing procedures among its own employees to delay and deny HAMP applications. Meanwhile, the plaintiffs suggest that BOA enlisted Urban—a third-party vendor—to (1) "serve[] as a 'black-hole' for the documents that borrowers sent in the course of trying to obtain permanent loan modifications," App. 112; (2) create internal databases for scattering documents so it would appear that borrowers failed to provide requested documents; and (3) make it easier to conceal the enterprise's activities. *See In re ClassicStar Mare Lease Litig.*, 727 F.3d at 492 (recognizing that "corporate defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity"). *See also Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 262-64 (2d Cir. 1995) (concluding that individual defendant and his two corporations in distinct lines of business were necessarily distinct from each other as well as from the alleged association-in-fact enterprise).

We conclude these allegations are sufficient to plausibly allege that BOA is both sufficiently distinct from the BOA-Urban association-in-fact enterprise and that BOA conducted the affairs of the enterprise rather than simply its own affairs. Because the plaintiffs plausibly allege the existence of an association-in-fact enterprise distinct from BOA, we hold that the district court erred in concluding the plaintiffs failed to adequately plead the enterprise element of their RICO claim.

12

**B.    The plaintiffs sufficiently allege Urban's participation in the conduct of the alleged enterprise.**

Next, the plaintiffs challenge the district court's conclusion that they failed to adequately plead Urban's participation in the conduct of the alleged enterprise. Urban urges us to affirm the district court's ruling, arguing that the plaintiffs' allegations show only that BOA assigned certain tasks to Urban, that BOA directed Urban's performance of those tasks, and that Urban merely provided its regular services to BOA by performing those tasks.

RICO requires a showing that the defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs." 18 U.S.C. § 1962(c). This, in turn, requires a showing that the defendant "participate[d] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Under *Reves*' operation or management test, the defendant must have "some part in directing" the enterprise's affairs. *Id.* at 179. But importantly, the defendant need not have "primary responsibility for the enterprise's affairs," "a formal position in the enterprise," or "significant control over or within an enterprise." *Id.* at 179 & n.4, 184. Instead, even "lower rung participants in the enterprise who are under the direction of upper management" may be liable under RICO if they have "some part" in operating or managing the enterprise's affairs. *Id.* at 179, 184. *See also BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1100 (10th Cir. 1999) (applying *Reves*). Nevertheless, a defendant must do

13

more than simply provide, through its regular course of business, goods and services that ultimately benefit the enterprise. *Id.* at 1101-02.

As we've discussed, the plaintiffs allege BOA and Urban formed an association-in-fact enterprise to pursue the common goal of wrongfully denying HAMP modification loans to eligible borrowers. Further, they allege that BOA delegated certain tasks to Urban and directed or supervised Urban's performance of those tasks.

Here, after discussing *Reves*' operation and management test, the district court misidentified the relevant question as: "whether, as an outside contractor having no official position within the enterprise, Urban [was] nonetheless liable for having an association with and exerting control over the enterprise." App. 257. Citing the principle from *BancOklahoma* that a corporate defendant isn't liable under RICO simply for providing its regular services to a RICO enterprise, the district court then reasoned that the plaintiffs' allegations demonstrated, at most, that Urban provided its regular services to BOA, at BOA's direction, and did not operate or manage the enterprise's affairs.

Because the plaintiffs allege an association-in-fact enterprise composed primarily of BOA and Urban, the district court mistakenly characterized Urban as an "outside contractor having no official position" in the enterprise. *Id.* While Urban had no official position in BOA, as we've discussed, BOA was not the alleged enterprise. The district court then compounded this error by concluding that the plaintiffs'

14

allegations showed that Urban merely provided its regular services to BOA by performing tasks BOA assigned and by carrying out BOA's directions.

On appeal, Urban mentions the district court's conclusion that Urban was an "outsider" that merely provided its regular services to BOA. But in urging us to affirm the district court's ruling, Urban primarily argues that the plaintiffs' allegations show only that Urban performed tasks at BOA's direction. The plaintiffs, on the other hand, suggest that Urban's role in the enterprise exceeded that of simply performing tasks as directed by BOA. They contend that Urban's role in the enterprise was that of a lower-rung participant knowingly carrying out BOA's orders. In support, the plaintiffs cite *Reves*, 507 U.S. 170, *United States v. Hutchinson*, 573 F.3d 1011 (10th Cir. 2009), *Resolution Trust Corp. v. Stone*, 998 F.2d 1534 (10th Cir. 1993), and two cases from other circuits—*Ouwinga v. Benistar 419 Plan Services, Inc.*, 694 F.3d 783 (6th Cir. 2012), and *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 967 (7th Cir. 1995).

As we've noted, *Reves* clarified that even "lower rung participants in the enterprise who are under the direction of upper management" may be held liable under RICO if they have "some part" in operating or managing the enterprise's affairs. 507 U.S. at 179, 184. Applying this principle in *Hutchinson*, we concluded that three individuals who collectively engaged in dealing narcotics out of the same motel were members of an association-in-fact enterprise and that one of those dealers conducted the enterprise's affairs when he acted under the direction of other dealers but also exercised discretion and disciplined his own underlings. 573 F.3d at 1033-

15

35. Similarly, in *Resolution Trust* we noted that the essence of the alleged association-in-fact enterprise was the fraudulent and deceptive sale of enhanced automobile receivables. And we concluded that a defendant corporation participated in the conduct of that alleged enterprise's affairs through its employees' and officers' acts of signing checks, guaranteeing loans to further the enterprise, and entering into a funding agreement to help the enterprise purchase automobile loans that would be repackaged as receivables. 998 F.2d at 1542.

Urging us to distinguish these cases, Urban suggests that (1) Urban had less autonomy than the lower-rung narcotics dealer in *Hutchinson* and (2) BOA and Urban's business relationship doesn't mirror the close corporate relationship between the enterprise members in *Resolution Trust*. But Urban's attempts are unavailing. As the plaintiffs argue, both of these cases demonstrate that a plaintiff can easily satisfy *Reves*' operation and management test by showing that an enterprise member played some part—even a bit part—in conducting the enterprise's affairs.

We also find instructive the two out-of-circuit cases cited by plaintiffs, *Ouwinga* and *MCM Partners*. In *MCM Partners*, the plaintiff alleged that two exhibition contractors, a rental equipment company, and the principals of all three entities formed an association-in-fact enterprise whose alleged purpose was to make the rental equipment company, OG, the exclusive provider of certain services at a Chicago venue. 62 F.3d at 969-70, 977-78. On appeal from the district court's Rule 12(b)(6) dismissal of the plaintiff's § 1962(c) RICO claim, the Seventh Circuit extensively considered *Reves*' suggestion that even lower-rung participants can

16

operate or manage an enterprise. The court noted that the complaint identified both exhibition contractors as members of the alleged association-in-fact enterprise. And it reasoned that even if both contractors reluctantly participated in the enterprise or acted at the direction of upper management, "they still knowingly implemented management's decisions, thereby enabling the enterprise to achieve its goals." *Id.* at 969, 978-79. Based on its conclusion that the plaintiff sufficiently alleged that both contractors conducted the enterprise's affairs, the Seventh Circuit reversed the dismissal of the RICO claim. *Id.* at 979.

Similarly, in *Ouwinga*, the Sixth Circuit concluded that the plaintiffs plausibly alleged that various defendants who had no part in designing the alleged enterprise's fraudulent plan nevertheless conducted the enterprise's affairs by knowingly marketing a tax-benefit plan to investors, providing incomplete and misleading legal opinions about the viability of that plan, and misrepresenting the plan as a tax-saving device. 694 F.3d at 791-93. In rejecting the district court's conclusion that the plaintiffs' allegations failed to satisfy *Reves*' operation or management test, the court noted that whether the defendants did more than conduct their own affairs was "a matter to be fleshed out in discovery" and held that the plaintiffs' allegations were sufficient to withstand a Rule 12(b)(6) motion to dismiss. *Id.*

As in *Ouwinga* and *MCM Partners*, we are tasked with deciding whether the plaintiffs' allegations are sufficient to withstand a motion to dismiss—not whether the plaintiffs can ultimately establish that Urban conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs sufficient to satisfy 18 U.S.C.

17

§ 1962(c). And as in those cases, we conclude the plaintiffs here have alleged facts regarding Urban's conduct of the enterprise's affairs that—while they may require fleshing out at the discovery stage—are sufficient to withstand dismissal.

Namely, in paragraph 80 of their first amended complaint[4] the plaintiffs offer specifics regarding Urban's actions to further the enterprise's goals. For example, the plaintiffs assert that Urban created internal systems for receiving and processing borrower documents, communicating with borrowers, and dispersing received documents over multiple databases to make it appear that borrowers failed to provide requested documents. Moreover, the plaintiffs assert that Urban decided whether to steer borrowers toward HAMP or other BOA loan modification programs; determined which applications to deny to meet BOA's processing quotas and timeframes; created and implemented methods for closing files in a manner that could be justified if audited; and delegated tasks to Urban employees to meet BOA's production targets for denying applications.

Contrary to Urban's position, these allegations plausibly assert that Urban played some part in directing the enterprise's affairs, regardless of whether BOA directed some or all of Urban's activities. *See Ouwinga*, 694 F.3d at 792 (explaining that having "some part in directing the *enterprise's* affairs . . . can be accomplished

---

[4] Urban contends that the plaintiffs assert legal conclusions encompassing *Reves'* general principles but that they fail to assert supporting factual allegations. Notably, Urban fails to address the specific allegations in paragraph 80 of the first amended complaint.

either by making decisions on behalf of the enterprise *or by knowingly carrying them out*" (quoting *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008))).

Thus, we conclude that at this stage of the litigation, the plaintiffs have sufficiently alleged Urban's participation in the conduct of the alleged enterprise.

**C. The plaintiffs sufficiently allege that BOA and Urban engaged in a pattern of racketeering activity.**

Alternatively, both defendants argue that even if we conclude that the plaintiffs' allegations are sufficient to support the first two RICO elements, we can nevertheless affirm the district court's dismissal of the RICO claim because the plaintiffs haven't sufficiently pled a pattern of racketeering activity.

Although the district court declined to decide this issue, the defendants accurately note that we may affirm the district court's Rule 12(b)(6) dismissal on any ground sufficiently supported by the record. *See GF Gaming Corp. v. City of Black Hawk*, 405 F.3d 876, 881-82 (10th Cir. 2005). Nevertheless, we disagree with their assertions that the plaintiffs fail to adequately plead a pattern of racketeering activity.

As defined in 18 U.S.C. § 1961(1)(B), "racketeering activity" includes indictable acts of mail and wire fraud as prohibited under 18 U.S.C. §§ 1341 and 1343, respectively.[5] To establish a pattern of racketeering activity, the plaintiffs must allege at least two predicate acts. *See* 18 U.S.C. § 1961(5) (requiring at least two

---

[5] In addition to acts of mail and wire fraud, the plaintiffs also allege acts of extortion—another RICO predicate act. Because we conclude that the plaintiffs plausibly allege at least two predicate acts of mail and wire fraud, we find it unnecessary to consider the sufficiency of their extortion allegations.

19

predicate acts to establish "pattern of racketeering activity"); *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 838 (10th Cir. 2005). But, "while two acts are necessary, they may not be sufficient" to establish a pattern. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n.14 (1985). *See Resolution Trust Corp.*, 998 F.2d at 1543 (explaining that the pattern element requires plaintiff to show "a relationship between predicates" and "the threat of continuing activity" (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989))).

Here, the plaintiffs allege that BOA and Urban committed several acts of mail and wire fraud while conducting the affairs of the BOA-Urban enterprise between 2009 and 2013. To support the mail and wire fraud allegations, the plaintiffs must plausibly allege "the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises," and that BOA and Urban communicated, or caused communications to occur, through the U.S. mail or interstate wires to execute that fraudulent scheme. *Tal v. Hogan,* 453 F.3d 1244, 1263 (10th Cir. 2006) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 892 (10th Cir. 1991)). And because Fed. R. Civ. P. 9(b) requires a plaintiff to plead mail and wire fraud with particularity, the plaintiffs must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (quoting *In re Edmonds*, 924 F.2d 176, 180 (10th Cir. 1991)).

The plaintiffs generally allege that BOA and Urban developed and implemented a scheme to feign BOA's compliance with HAMP guidelines while

20

permanently modifying as few loans as possible. According to the plaintiffs, the enterprise's dilatory tactics and wrongful denial of HAMP loan modifications defrauded borrowers of money. The plaintiffs specifically allege BOA profited from the fraud by improperly charging fees associated with delinquent loans and by "push[ing] homeowners into in-house modifications" that carried higher interest rates than those associated with HAMP loan modifications. App. 98. The plaintiffs allege that BOA and Urban fraudulently used the mail and wires to further this scheme by making false statements and promises to borrowers about (1) the status of their HAMP applications, (2) the receipt of requested documents and TPP payments, and (3) their ultimate eligibility for HAMP loan modifications.

BOA argues that most of the plaintiffs' allegations are too "vague and generic" to satisfy Rule 9(b)'s pleading requirements and that even if some of plaintiffs' allegations are more specific, those allegations nevertheless fail to plausibly allege that BOA made any false statements to borrowers. BOA Br. 27. Urban similarly contends that the plaintiffs' allegations aren't sufficiently specific—at least as to Urban—arguing that the plaintiffs "rely on misrepresentations allegedly made by BOA or its employees," but "fail to identify a single misrepresentation made by Urban." Urban Br. at 24.

The plaintiffs generally maintain that their allegations are sufficiently specific to apprise both defendants of the time, place, and contents of the allegedly false misrepresentations made by BOA and Urban employees, thus satisfying Rule 9(b)'s pleading standard. In specific response to BOA's argument, the plaintiffs assert that

21

BOA "cherry-picked certain allegations, and ignored countless others" to support its position that the plaintiffs fail to satisfy Rule 9(b). Aplt. Reply Br. 10. And in response to Urban's argument, the plaintiffs assert that when "some facts are peculiarly within the opposing party's control," the plaintiff "may not be able to allege the full factual circumstances without first conducting discovery." Aplt. Reply Br. 15. The plaintiffs point out that "a key part of the enterprise[']s scheme was to keep Urban's identity secret by having employees represent themselves as BOA employees, and making Urban documents appear to come from BOA's 'Office of the President.'" Aplt. Reply Br. 17. The plaintiffs argue that, under these circumstances and without further discovery, they have made their allegations regarding Urban's fraudulent acts as specific as possible.

Rule 9(b)'s purpose is "to afford [a] defendant fair notice" of a plaintiff's claims and the factual grounds supporting those claims. *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997). And, as the plaintiffs assert, in determining whether a plaintiff has satisfied Rule 9(b), courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control. *See, e.g.*, *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998) (suggesting that "Rule 9(b) is relaxed upon a showing" that plaintiff is unable to obtain essential information in defendant's possession without pretrial discovery); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997) (explaining that Rule 9(b)'s "normally rigorous particularity rule has been relaxed somewhat where the factual information is

peculiarly within the defendant's knowledge or control" but that "even under a relaxed application of Rule 9(b) . . . [p]laintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible"); *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992) ("Allegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief.").

We agree with the defendants that not all of the plaintiffs' allegations satisfy Rule 9(b)'s pleading requirements. For instance, the plaintiffs only generally allege that Darrell Dalton, sometimes on specific dates, made phone calls to BOA, spoke with unidentified BOA employees who made false representations to him via phone, and received letters through the mail from BOA containing false and misleading statements. These general allegations don't suffice. *See Koch*, 203 F.3d at 1236 (explaining Rule 9(b)'s pleading requirements).

But in other allegations, the plaintiffs identify BOA employees by name, specify the dates when those employees made allegedly false statements, identify the actions the plaintiffs took in reliance on those misrepresentations, detail the injuries they suffered as a result, and explain how those misrepresentations furthered the enterprise's ultimate goal of denying HAMP applications.

For example, the plaintiffs allege that Steven and Sandra Leavitt received a HAMP application packet by mail on November 3, 2011, and returned requested documents to BOA eight days later. The plaintiffs allege that "[o]ver the next several

23

months, the Leavitts called [BOA employee] Mr. Delgadillo at least 1-2 times each week to inquire as to the status of their application" and that "[t]hey were repeatedly told, in telephone communications, that their application was 'under review' and that they could expect to hear back from BOA any day." App. 130. The plaintiffs allege these statements "were knowingly and intentionally false." *Id.*

Similarly, the plaintiffs allege that BOA sent Richard George TPP documents in June 2010. The documents set forth TPP terms and stated that if George satisfied those terms, then BOA would provide a HAMP modification. According to the plaintiffs, George returned the signed and notarized TPP agreement to "BAC Home Loans Servicing at an address in Broomfield, Colorado"; confirmed delivery of the agreement through a Federal Express tracking number; made all TPP payments on time; and fulfilled other TPP requirements. App. 138. Yet, according to the plaintiffs, "BOA sent Mr. George a Notice of Intent to Accelerate his loan dated January 4, 2011," and "[o]n January 30, 2011[,] Mr. George spoke to a [customer service] representative named Rosario, who stated their system did not show him to be in modification; claimed that BOA never received" the TPP agreement; "and claimed that the financial documents BOA requested had not been received." *Id.* at 139. The plaintiffs allege Rosario's "statements were knowingly and intentionally false, and made over interstate wires." *Id.* The plaintiffs also allege that on certain dates in February and March 2013 either George or his wife spoke with "the designated case manager, Mariah Williams," about their application and that Williams provided

24

conflicting information, sometimes in the same phone call, about whether BOA had or hadn't received necessary paperwork. *Id.* at 140.

We conclude that these allegations satisfy Rule 9(b) as to misrepresentations allegedly made by BOA; however, they present a closer question as to Urban.

As Urban points out, the plaintiffs fail to name Urban as the sender of misleading mailings or identify Urban employees as voicing misrepresentations over the phone. And, as Urban suggests, the plaintiffs' allegations that Urban engaged in racketeering activity largely "rely on misrepresentations allegedly made by BOA or its employees," rather than by Urban or its employees. Urban Br. 24.

We recognize that accusations against BOA dominate the plaintiffs' complaint, while specific accusations against Urban are sparse. Nonetheless, as the plaintiffs point out, they specifically allege that "[w]hen answering calls from customers, Urban employees identified themselves as being from BOA"; that "Urban employees were given titles and email addresses suggesting that they were employed by Bank of America"; and that "[b]orrowers were under the false impression that they were speaking to and corresponding with BOA when, in fact, they were interacting with Urban employees." App. 110-11. The plaintiffs further allege that BOA mailed each of the named plaintiffs specific loan modification documents on specific dates, that those documents contained allegedly fraudulent statements, and that those documents were either mailed from, or instructed the plaintiffs to return them to, Urban's address.

Under the particular circumstances of this case, we conclude that the plaintiffs' allegations, at this stage and taken as a whole, sufficiently apprised Urban of its alleged role in the overall scheme to defraud borrowers and of its involvement in the alleged predicate acts of mail and wire fraud. *See Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) ("Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 680 (6th Cir. 1988))).

Reviewing the plaintiffs' entire complaint and taking all of their allegations as true, as we must, *Hogan*, 762 F.3d at 1104, we conclude that the plaintiffs' allegations satisfy Rule 9(b)'s requirements and plausibly allege that both BOA and Urban engaged in a pattern of racketeering activity.

### D.  Conclusion

Because the plaintiffs sufficiently allege the existence of a RICO association-in-fact enterprise distinct from BOA, Urban's participation in the conduct of that enterprise, and that both defendants engaged in a pattern of racketeering activity, we reverse the district court's dismissal of the plaintiffs' RICO claim and remand for further proceedings.

## II.  The district court erroneously dismissed the plaintiffs' promissory estoppel claim.

Next, the plaintiffs argue the district court erred in ruling that they failed to plausibly allege a promissory estoppel claim against BOA. Specifically, the plaintiffs

26

contend they sufficiently alleged this claim when they described BOA's

unambiguous promises to provide permanent HAMP loan modifications for eligible

borrowers and BOA's failure to follow through on those promises.

"Promissory estoppel is an extension of the basic contract principle that one

who makes promises must be required to keep them." *Schulz v. City of Longmont*,

465 F.3d 433, 438 n.8 (10th Cir. 2006) (quoting *Patzer v. City of Loveland*, 80 P.3d

908, 912 (Colo. App. 2003)). Under Colorado law,[6] the elements of promissory

estoppel are: (1) a promise, (2) that the promisor should have expected would induce

action or forbearance by the promisee, (3) that the promisee did, in fact, reasonably

rely on to the promisee's detriment, and (4) that must be enforced to prevent

injustice. *Id.*

Although BOA argued below that the plaintiffs failed to plausibly allege the

first three elements of their promissory estoppel claim, the district court concluded

that the plaintiffs failed to sufficiently plead the first element—a promise—and

didn't rule on whether the plaintiffs sufficiently pled other elements. Specifically, the

court concluded that BOA made no clear and unambiguous promises that it would

provide permanent HAMP loan modifications to eligible borrowers who complied

with TPPs. BOA urges us to affirm the district court's dismissal of the promissory

---

[6] The plaintiffs asserted a promissory estoppel claim against BOA on behalf of class members from several different states, including Colorado, and asserted that each state's law governing promissory estoppel was substantially similar. The district court applied Colorado law to the promissory estoppel claim, and the parties do the same in their appellate briefs. Thus, we have applied Colorado law to the promissory estoppel claim.

estoppel claim on that basis alone. Alternatively, BOA renews its argument that the plaintiffs fail to adequately plead the third element—reasonable and detrimental reliance on the alleged promise.

The plaintiffs, on the other hand, argue they sufficiently allege all four elements of their promissory estoppel claim. They specifically argue that the district court's conclusion that they failed to sufficiently allege a clear and ambiguous promise is contrary to the weight of authority from circuit courts that have addressed that element in similar cases.

### A. The plaintiffs sufficiently allege a promise.

A plaintiff asserting promissory estoppel must ultimately establish that the defendant made a "clear and unambiguous" promise. *G & A Land, LLC v. City of Brighton*, 233 P.3d 701, 704 (Colo. App. 2010) (quoting *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 114 (Colo App. 1994)).

Here, the plaintiffs allege that BOA clearly and unambiguously promised, on its website and in TPP documents, that it would provide permanent HAMP loan modifications to eligible borrowers who complied with TPPs. Specifically, the plaintiffs allege that BOA's website indicated, "If you successfully make your payments during the 3-month trial period, and the documentation provided supports the initial review, we will sign off and your modification will become permanent." App. 93 (emphasis omitted).[7]

---

[7] The plaintiffs incorporate screenshots of the BOA website and refer in the first amended complaint to TPP document provisions, but the plaintiffs don't attach

28

Further, the plaintiffs allege BOA made the same promises to George in June 2010 and to the Leavitts in March 2012, when BOA sent them TPP documents. Specifically, the plaintiffs assert that BOA sent George a cover letter promising,

> After you successfully complete your [TPP] by making timely payments and returning the [TPP] Agreement, we will send you additional documents. These documents will include a Partial Claim and FHA-Home Affordable Modification Agreement that you will need to sign and return before your loan will be permanently modified.

*Id.* at 137.

The plaintiffs allege BOA sent the Leavitts a similar cover letter promising, "After you successfully complete your [TPP] by making timely payments and returning the Trial Period Plan Agreement, we will send you documentation that describes all of the terms of your permanent loan modification." *Id.* at 131. BOA also sent George and the Leavitts TPP agreements which indicated in Section 1,

> If I am in compliance with this [TPP] (the "Plan") and my representations in Section 1 continue to be true and correct in all material respects, then the Servicer will provide me with a Partial Claim and FHA-Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would bring my loan current and amend and supplement (1) the Mortgage or Deed of Trust on the Property, and (2) the Note secured by the Mortgage or Deed of Trust.

*Id.* at 186, 194.

In turn, Section 3 of both TPP agreements stated, in part:

---

any TPP documents to the complaint. But because those documents are included in the appellate record and BOA doesn't dispute their authenticity, we may consider them. *See Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013) (pointing out that the court may consider, in evaluating a Rule 12(b)(6) motion, "documents referred to in the complaint [and] central to the plaintiff's claim [if] the parties do not dispute the documents' authenticity" (quoting *Gee v. Pacheo*, 627 F.3d 1178, 1186 (10th Cir. 2010))).

> If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true and correct and fulfill all my obligations in Section 4, the Servicer will send me a Partial Claim, which will cure my default, and Modification Agreement for my signature, which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date.

*Id.* at 188, 196.

At least three of our sister circuits have found nearly identical language in TPP documents sufficiently clear to constitute an enforceable promise. *See, e.g.*, *Corvello v. Wells Fargo Bank, N.A.*, 728 F.3d 878, 880-85 (9th Cir. 2013) (reversing Rule 12(b)(6) dismissal of promissory estoppel and breach of contract claims); *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 234, 242 (1st Cir. 2013) (vacating Rule 12(b)(6) dismissal of breach of contract claim); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 554, 558, 561-63 (7th Cir. 2012) (reversing Rule 12(b)(6) dismissal of promissory estoppel and breach of contract claims).

The district court acknowledged *Wigod*, *Corvello*, and *Young*. But it suggested that other circuits have reached the opposite conclusion, generating a circuit split. *See* App. 266-68 (citing *Bloch v. Wells Fargo Home Mortg., Inc.*, 755 F.3d 886 (11th Cir. 2014); *Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436 (8th Cir. 2013); *DeLuca v. CitiMortgage*, 543 F. App'x 194 (3d Cir. 2013) (unpublished); *Miller v. Chase Home Fin., LLC*, 677 F.3d 1113 (11th Cir. 2012); *Pennington v. HSBC Bank USA, N.A.*, 493 F. App'x 548 (5th Cir. 2012) (unpublished)).

Relying on some of these cases, the district court interpreted the TPP documents here as conditional because they contain language indicating that the TPP

itself did not modify the loan, that BOA retained discretion to decline the plaintiffs' requests for modifications if they failed to comply with the TPPs, and that BOA alternatively retained discretion to determine whether the plaintiffs complied with the TPPs. The district court reasoned that this qualifying language undermined the plaintiffs' allegations that the TPP documents contain clear and unambiguous promises to provide permanent loan modifications.

Initially, we agree with the plaintiffs that the district court erred in suggesting the existence of a circuit split on this issue.[8] Instead, our examination of the cases the district court relied on reveals that other circuits have declined to find clear and unambiguous promises when considering documents or circumstances that differ significantly from those present in *Wigod*, *Corvello*, and *Young*. *See Bloch*, 755 F.3d at 889 (concluding that letter stating plaintiffs "*might* be eligible for *trial* modification under HAMP" was not a binding promise to provide *permanent* HAMP loan modification); *Freitas*, 703 F.3d at 440-41 (affirming dismissal of promissory estoppel claim without citing or analyzing any specific TPP language when plaintiff admitted that bank never provided a consistent answer regarding loan modification); *Miller*, 677 F.3d at 1116-17 (rejecting promissory estoppel claim based on defendant's alleged promise to permanently modify loan because plaintiff's allegations suggested defendant only promised to *temporarily* modify terms of loan);

---

[8] That being said, the district court's rationale is consistent with that of several other district courts. *See Sutcliffe v. Wells Fargo Bank, N.A.*, 283 F.R.D. 533, 549-50 (N.D. Cal. 2012) (collecting cases and noting split of authority among district courts as to whether TPP documents create an enforceable contract for a permanent loan modification).

*Pennington*, 493 F. App'x at 551, 556 (affirming dismissal of promissory estoppel claim because bank conditioned statement that plaintiff would be approved on her inability to make loan payments; noting that plaintiff's reliance on conditional promise was "especially improper" because she admitted in her complaint that she had the financial ability to make her payments). And while the remaining case the district court relied on generally supports the district court's rationale, the opinion also expressly disavows that it has any precedential value. *See DeLuca*, 543 F. App'x at 196-97 (relying on qualifying language in TPP documents to reject promissory estoppel claim but explicitly stating in body of opinion that opinion lacks any precedential value and was written "only for the parties").

In sum, the cases the district court characterized as reaching the opposite conclusion regarding the existence of a promise rely on decidedly different facts than those in *Wigod*, *Corvello*, and *Young*. Moreover, we find the reasoning of *Wigod*, *Corvello*, and *Young* persuasive. Notably, in all three of those cases the courts analyzed language nearly identical to language in the TPP documents that BOA sent to the Leavitts and George. And all three courts rejected the specific argument BOA makes here—that it made no clear and unambiguous promises in TPP documents because conditional language in the TPP documents provided that BOA "remained free to decline to offer permanent modifications" (1) if the plaintiffs failed to satisfy TPP requirements or (2) if the plaintiffs' representations concerning their eligibility didn't remain "true and correct in all material respects." BOA Br. 35. *See Corvello*, 728 F.3d at 883 (rejecting defendant's argument that conditional language in TPP

32

document could "convert a purported agreement setting forth clear obligations into a decision left to the unfettered discretion of the loan servicer"); *Young*, 717 F.3d at 235 (rejecting defendants' interpretation of TPP agreement as conditional because that interpretation "would permit [defendants] to exercise an unfettered right to withhold a permanent modification offer for an uncertain period of time after the modification effective date has passed, thereby erasing the benefits to the plaintiff of her compliance with the TPP"); *Wigod*, 673 F.3d at 565 (stating that while bank may have retained "some limited discretion to set the precise terms of an offered permanent modification, it was certainly required to offer *some* sort of good-faith permanent modification").

Similarly, we conclude that the language in BOA's TPP documents clearly and unambiguously promises to provide permanent HAMP loan modifications to borrowers who comply with the terms of their TPPs. And this is true regardless of whether those TPP documents state that promise inversely—i.e., that if the borrowers fail to comply with TPP terms, BOA will not modify the loan. Moreover, the fact that the TPP further requires the borrower to sign a modification agreement before BOA will permanently modify the loan does not render BOA's promise to modify the loan if the borrower complies with all other TPP terms any less clear. Thus, we conclude the plaintiffs plausibly allege that BOA made clear and unambiguous promises—in TPP documents and on its website—to provide permanent HAMP loan modifications for eligible borrowers who complied with TPPs.

**B.** **The plaintiffs sufficiently allege reasonable and detrimental reliance.**

Because it found no clear and unambiguous promises in TPP documents, the district court didn't consider BOA's arguments that the plaintiffs' factual allegations failed to support the remaining elements of their promissory estoppel claim. On appeal, BOA renews only its argument that the plaintiffs didn't sufficiently plead reasonable and detrimental reliance. Exercising de novo review, we consider this argument to determine whether we can affirm the district court's dismissal of the promissory estoppel claim on a ground other than the one cited by the district court. *See GF Gaming Corp.*, 405 F.3d at 881-82 (noting we may affirm a district court's Rule 12(b)(6) dismissal on any ground sufficiently supported by the record).

The plaintiffs allege they reasonably relied to their detriment on BOA's promise to provide a permanent loan modification and that BOA could reasonably foresee their reliance. Specifically, the plaintiffs allege the Leavitts and George complied with the terms of their TPPs by making lower mortgage payments and by fulfilling other requirements. And they point out that BOA eventually sent permanent loan modification offers to the Leavitts and George. According to the plaintiffs, this indicates BOA determined that (1) the plaintiffs were eligible for permanent modifications and (2) they complied with the terms of their respective TPPs.

Nevertheless, BOA didn't permanently modify the plaintiffs' loans. Instead, according to the plaintiffs, after the Leavitts returned their signed and notarized modification documents, BOA sold the Leavitts' loan to another servicer in

34

November 2012 without reflecting any modification. Similarly, George returned his signed and notarized modification documents in March 2013. But the plaintiffs allege that as of August 2013, BOA continued to send George "false and often conflicting information . . . regarding the status of [his] loan, and any modification." App. 141. Because BOA never permanently modified their loans, the plaintiffs allege the lower payments they made in reliance on BOA's promise and in compliance with their obligations under the TPPs resulted in longer payoff times, higher principal balances, increased accrued interest, and additional charges and fees related to delinquency and default.[9]

Relying on *Pennington v. HSBC Bank USA, N.A.*, 493 F. App'x 548 (5th Cir. 2012) (unpublished), BOA reasserts that even if it made promises in TPP documents, it "expressly conditioned [those promises] upon [plaintiffs'] compliance with TPP requirements and [plaintiffs'] representations remaining true and correct throughout the trial period." BOA Br. 40-41. Thus, BOA maintains, it was unreasonable for the plaintiffs to rely on those conditional promises. But we've rejected BOA's argument that it made no clear and unambiguous promises. And, in any event, *Pennington* doesn't support BOA's argument. There, the court found it unreasonable for the

---

[9] Based on the plaintiffs' first amended complaint, it doesn't appear that BOA sent the same TPP documents to the fourth plaintiff, Darrell Dalton. But the plaintiffs allege BOA made similar promises to Dalton, both orally and in writing, and that Dalton repeatedly entered into and complied with the terms of his TPPs in his attempt to obtain an "internal modification" rather than a HAMP loan modification. App. 146. They further allege Dalton relied on BOA's promises and suffered the same injuries as the other plaintiffs. Despite some distinctions between Dalton's and the other plaintiffs' interactions with BOA, our analysis and conclusions regarding the promissory estoppel claim apply equally to all of the plaintiffs.

plaintiff to rely on any bank promise to modify her loan because she admitted in her complaint that she never fell behind on mortgage payments before applying for a permanent HAMP loan modification. Consequently, she wasn't eligible for modification. *Id.* at 551, 556. Even if we agreed with that rationale, it wouldn't apply here; the plaintiffs allege that BOA sent them modification agreements after the plaintiffs complied with the terms of their TPPs, thereby confirming the plaintiffs' eligibility for permanent loan modifications.

Relying again on *Pennington*, BOA argues that the plaintiffs can't show detrimental reliance simply by asserting they made payments under their TPPs because the plaintiffs already were obligated to make even higher payments under their original mortgage terms. *See Pennington*, 493 F. App'x at 557 (concluding that plaintiff's payment of lower TPP payments didn't demonstrate detrimental reliance because those payments "were just applied to the loan"). But even if we were to find persuasive *Pennington*'s conclusion that it is insufficient for plaintiffs to claim detrimental reliance based on making lower payments to comply with TPPs, the plaintiffs allege more than that here. As noted, the plaintiffs allege that their decision to comply with their TPP obligations by submitting lower payments also resulted in "longer loan payoff times, higher principal balances, improper negative reporting to credit bureaus," and various improperly assessed and unnecessary fees, charges, and costs. App. 166.

Again, we find *Wigod*'s reasoning persuasive. Like the plaintiffs here, the plaintiff in *Wigod* alleged that her mortgage servicer unambiguously promised to

36

permanently modify her loan if she complied with the terms of her TPP. And, like the plaintiffs here, the plaintiff in *Wigod* also alleged "that she relied on that promise to her detriment by foregoing the opportunity to use other remedies to save her home . . . and by devoting her resources to making the lower monthly payments under the TPP Agreement rather than attempting to sell her home or simply defaulting." *Wigod*, 673 F.3d at 566. The Seventh Circuit found the plaintiff's allegations sufficiently alleged reasonable and detrimental reliance, reasoning, "A lost opportunity can constitute a sufficient detriment to support a promissory estoppel claim." *Id.*

We agree. Taking all of their allegations as true, we conclude that the plaintiffs sufficiently allege that they reasonably relied on BOA's unambiguous promises and consequently lost opportunities to pursue other remedies. Ultimately, the plaintiffs allege their compliance with their individual TPPs, along with BOA's failure to follow through on its promises to permanently modify their loans, left plaintiffs in worse financial positions relative to their mortgages. Under these circumstances, we further conclude that the plaintiffs sufficiently allege reasonable and detrimental reliance and that their allegations, as a whole, "present a facially plausible claim of promissory estoppel." *Wigod*, 673 F.3d at 566. Accordingly, we reverse the district court's dismissal of that claim.

## CONCLUSION

The district court erred, both in dismissing the plaintiffs' RICO claim against BOA and Urban and in dismissing the plaintiffs' promissory estoppel claim against BOA. Accordingly, we reverse the district court's order and remand for further

37

proceedings. Finally, we dismiss as moot the plaintiffs' challenge to the district

court's denial of their request to further amend the complaint.