**Lisa FLAGG, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**FIRST PREMIER BANK, a South Dakota State–Chartered Bank, Defendant.**

CIVIL ACTION FILE NO. 1:15–CV–324–MHC

United States District Court, N.D. Georgia, Atlanta Division.

Signed 06/07/2017

Darren T. Kaplan, Darren Kaplan Law Firm, P.C., Atlanta, GA, Hassan A. Zavareei, pro hac vice, Jeffrey D. Kaliel, pro hac vice, Tycko & Zavareei, LLP, Washington, DC, Jason H. Alperstein, Jeffrey Miles Ostrow, pro hac vice, Kopelowitz Ostrow Ferguson Weiselberg Keechl, Fort Lauderdale, FL, John Austin Moore, pro hac vice, Norman E. Siegel, pro hac vice, Stephen N. Six, pro hac vice, Stueve Siegel

Hanson, LLP, Kansas City, MO, for Plaintiff.

Bryan R. Freeman, John C. Ekman, James P. McCarthy, pro hac vice, Lindquist & Vennum, Minneapolis, MN, Scott Eric Zweigel, William J. Holley, II, Parker, Hudson, Rainer & Dobbs, LLP, Atlanta, GA, for Defendant.

## ORDER

MARK H. COHEN, United States District Judge

This case comes before the Court on Defendant First Premier Bank's Motion to Dismiss [Doc. 65] and Motion to Continue Certain Preliminary Deadlines [Doc. 66].

## I. BACKGROUND

On January 30, 2015, Plaintiff Lisa Flagg ("Plaintiff"), on behalf of herself and a prospective class, commenced this action against Defendant First Premier Bank ("Defendant"), a South Dakota State-Chartered Bank. Plaintiff alleges, *inter alia*, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (2012). Second Am. Compl. [Doc. 64]. These allegations arise from Plaintiff's interactions with online payday lenders, including Payment Direct, Inc., d/b/a First International SRS ("First International"), and Defendant's role in those transactions. Id. ¶¶ 16, 75–77.

According to Plaintiff's Second Amended Complaint, First International is an entity engaged in the practice of making online payday loans, and collecting debts related to such loans, to persons residing in states, including Georgia, where such loans are illegal. Id. ¶¶ 16, 95. A payday loan is a short-term, high fee, closed-end loan, traditionally made to borrowers to provide funds in anticipation of an upcoming paycheck. Id. ¶ 31. A borrower obtaining a payday loan from an online lender must usually sign an Automated Clearing House ("ACH") authorization agreement which

purports to give the lender authority to electronically debit and credit loan transactions. Id.

The "ACH Network" or "Automated Clearing House," a secure electronic payment transfer network, is a processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing. Id. ¶¶ 1, 39. Instead of using paper (like checks) to carry necessary transaction information, ACH Network transactions are transmitted electronically, allowing for faster processing times and cost savings. Id. The debit and credit transactions between borrowers and lenders like First International are performed by entities known as Originating Depository Financial Institutions ("ODFIs"), which are banks, including Defendant, belonging to the ACH Network. Id. ¶¶ 8–10, 35–36, 104. An ODFI is supposed to engage in extensive due diligence procedures prior to entering into an agreement with a merchant seeking to use the ACH Network to electronically process transactions. Id. ¶ 31.

Plaintiff alleges that Defendant actively participated in an unlawful scheme by granting illegal payday lenders' requests to "initiate" ACH entries representing payday loan credits and debits to and from consumer checking accounts, and knowingly taking affirmative steps to "originate" these illegal entries into the ACH Network, thereby enforcing debts Defendant knew to be unlawful. Id. ¶ 10. Defendant allegedly profited from its participation in this scheme by charging payday lenders higher-than-customary fees to originate transactions on the ACH Network. Id. ¶¶ 10, 75–78.

The following allegations are specific to Plaintiff Lisa Flagg. In August 2012, First International acquired the customer list of online payday lender First National Funding, Inc. for the sole purpose of soliciting

and making new loans to First National Funding, Inc.'s previous or pending customers. Id. ¶ 86. During the same month, First International solicited Plaintiff to make a new payday loan and directed her to a website operated by First International. Id. ¶ 87. On or about August 31, 2012, May 31, 2013, and July 2, 2013, Plaintiff received payday loans in the amount of $250.00, $225.00, and $220.00, respectively, from First International. Id. ¶ 88. The nominal annual interest rate stated in the loan agreements for these loans was 899.46%. Id. Plaintiff was required to provide an ACH authorization for her checking account with JPMorgan Chase Bank, N.A., in order to obtain the loans. Id.

Plaintiff further alleges that, even if timely paid off, payday loans offered by First International automatically renew unless the borrower affirmatively declines the renewal option at least three business days prior to the loan due date. Id. ¶ 89. On or about September 14, 2012, October 12, 2012, and July 19, 2013, First International initiated debit transactions in the amount of $335.00, $335.00, and $269.00, respectively, from Plaintiff's checking account in Georgia through the ACH Network. Id. ¶ 90. Defendant was the ODFI originating these transactions. Id. Plaintiff alleges that Defendant derived a benefit through the receipt of fees for its origination of debit entries on the ACH Network initiated by First International (or Third–Party Senders acting on their behalf) and received by Plaintiff. Id. ¶ 91.

Plaintiff filed her Second Amended Complaint on February 24, 2017, alleging that Defendant violated and/or conspired to violate 18 U.S.C. § 1962 under two separate theories of RICO liability (Counts One through Four). Id. ¶¶ 102–40. Plaintiff also brings state law claims for unjust enrichment (Count Five) and for violations of the Georgia Payday Lending Act, O.C.G.A. § 16–17–2 (Count Six). Id. ¶¶ 141–49, 150–59. Defendant has filed a motion to dismiss arguing that all counts of the Second Amended Complaint should be dismissed.[1]

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has explained this standard as follows:

A claim has facial plausibility when the plaintiff pleads factual content that al-

---

1. This case has a somewhat lengthy procedural history. Plaintiff's original complaint was filed on January 30, 2015. Compl. [Doc. 1]. On August 26, 2015, the Court denied Defendant's motion to compel arbitration [Doc. 28]. Defendant appealed from the denial of its motion, see Notice of Appeal [Doc. 29], and the Court granted Defendant's motion to stay proceedings in the case pending the appeal [Doc. 38]. On February 23, 2016, the United States Court of Appeals for the Eleventh Circuit affirmed the Court's denial of the motion to compel arbitration [Doc. 40]. On May 3, 2016, the Eleventh Circuit issued its mandate [Doc. 41] and this Court lifted the stay of proceedings on May 17, 2016 [Doc. 42].

Plaintiff filed her First Amended Complaint on May 17, 2016 [Doc. 43], which was followed by Defendant's motion to dismiss that complaint [Doc. 44]. On February 24, 2017, this Court, over Defendant's objection, granted Plaintiff's motion for leave to file a second amended complaint, which led to the denial of Defendant's first motion to dismiss as moot [Doc. 63]. The pending motion to dismiss was then filed by Defendant after Plaintiff filed her Second Amended Complaint.

lows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citation omitted). Thus, a claim will survive a motion to dismiss only if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555, 127 S.Ct. 1955.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the plaintiff's complaint as true, as well as all reasonable inferences drawn from those facts. McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). Not only must the court accept the well-pleaded allegations as true, but these allegations must also be construed in the light most favorable to the pleader. Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011). However, the court need not accept legal conclusions, nor must it accept as true legal conclusions couched as factual allegations. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. Thus, evaluation of a motion to dismiss requires the court to assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679, 129 S.Ct. 1937.

## III. DISCUSSION

### A. Plaintiff Has Failed to Sufficiently Allege Claims under RICO

#### 1. Plaintiff's First Alleged RICO Enterprise (Count One)

Plaintiff brings four claims against Defendant under the RICO statute. Counts One and Two allege alternative theories to support Defendant's participation in a

scheme to collect unlawful debts in violation of 18 U.S.C. § 1962(c), according to which is it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c); Second Am. Compl. ¶¶ 102–30. Counts Three and Four allege (again based on these respective theories) that Defendant participated in a conspiracy to collect unlawful debts in violation of 18 U.S.C. § 1962(d), which makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)[.]" 18 U.S.C. § 1962(d); Second Am. Compl. ¶¶ 131–40.

To prove a violation of 18 U.S.C. § 1962(c), a plaintiff must establish: (1) the existence of an enterprise which affects interstate or foreign commerce; (2) that the defendant associated with the enterprise; (3) that the defendant participated in or conducted the enterprise's affairs; and (4) that the participation in or conduct of the enterprise's affairs was through a pattern of racketeering activities. United States v. Goldin Indus., Inc., 219 F.3d 1271, 1274 (11th Cir. 2000) (citing United States v. Weinstein, 762 F.2d 1522, 1536 (11th Cir. 1985)).

18 U.S.C. § 1961(4) defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." "In the simple case, the enterprise is an 'individual, partnership, corporation, association, or other legal entity.' The more challenging case occurs when the enterprise is alleged to be a 'union or group of individuals associated in fact although not a legal entity.'" Almanza v. United Air-

lines, Inc., 851 F.3d 1060, 1067 (11th Cir. 2017) (citing and quoting 18 U.S.C. § 1961(4)). Plaintiff brings her claims under this "more challenging" association-in-fact theory of liability.

■ An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." Boyle v. United States, 556 U.S. 938, 946, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009) (quoting United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)). Although it need not have an "'ascertainable structure' distinct from the associations necessary to conduct the pattern of racketeering activity," Goldin Indus., 219 F.3d at 1275, an association-in-fact nevertheless "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle, 556 U.S. at 946, 129 S.Ct. 2237. "[T]he definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." Goldin Indus., 219 F.3d at 1275 (citing United States v. Elliott, 571 F.2d 880, 898 (5th Cir. 1978)).

■ Plaintiff's Counts One and Two allege the existence of what is effectively the same association-in-fact enterprise, albeit under the guise of alternative legal theories. Count One alleges an association-in-fact enterprise consisting of (1) originators, including payday lenders like First International; (2) third-party service providers, including Defendant; (3) ODFIs, including "all financial institutions participating in the ACH Network;" (4) ACH operators, including the Federal Reserve banks and the Electronic Payments Network, that receive entries from ODFIs; and (5) RDFIs, including "all depository financial institutions participating in the ACH Network," Second Am. Compl. ¶¶ 104–05, while Count Two (discussed infra) alleges a narrower association-in-fact enterprise consisting only of Defendant and First International. Id. ¶¶ 115–30. Plaintiff further alleges that Defendant plays a "distinct role" in operating, managing, and controlling the ACH network, including the "critical function of 'gatekeeper of the ACH Network,'" and that Defendant uses this gatekeeping role in the ACH Network to conduct unlawful debt collection by granting illegal payday lenders like First International access to the network Id. ¶¶ 105, 110. Thus, Plaintiff alleges that, per the Supreme Court's three-part test in Boyle, these entities (1) "share the common lawful and legitimate purpose of facilitating batch processing of electronic payments;" (2) "preserve close business relationships and maintain established and defined rules within the enterprise;" and (3) have been in existence for "many years" as part of an enterprise that is "still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose."

Defendant urges the Court to follow Parm v. Nat'l Bank of Cal., N.A., No. 4:14-CV-320-HLM, 2015 WL 11605748 (N.D. Ga. May 20, 2015), aff'd, 835 F.3d 1331 (11th Cir. 2016) (hereafter "Parm I"), in which another court in this district recently rejected an identical RICO claim.[2] Def.'s Mem. of Law in Supp. of Mot. to

---

**2.** The same court recently reaffirmed this conclusion in a subsequent order dismissing all of the plaintiff's claims, including identical theories of RICO liability. See March 6, 2017 Order [Doc. 88] at 73–111, Parm v. Nat'l Bank of Cal., N.A., No. 4:14–CV–320–HLM, 242 F.Supp.3d 1321, 1341–50, 2017 WL 2703855 (N.D. Ga. 2017) (hereafter "Parm II").

Dismiss [Doc. 65–1] ("Def.'s Mem.") at 8. In Parm I, as here, the plaintiff alleged the existence of an enterprise-in-fact made up of the same set of ACH Network participants, as part of which the defendant, a bank, "use[d] its role within the ACH Network Enterprise to conduct unlawful payday loan debt collection" by granting payday lenders access to the network. Parm I, 2015 WL 11605748, at *19. However, noting that, as pled, this alleged enterprise-in-fact would "include an entire industry and encompass an untold number of changing combinations resulting from the contractual relationships between ODFIs and Originators," id. at *22, the court ultimately concluded that the enterprise's "expansive size combined with its amorphous and constantly changing members along with the minimal connection between the various merchants allegedly involved in the enterprise" precluded its existence. Id. at *23. Although the court did not say so outright, arguably implicit in Parm I was a finding that the defendant did not adequately plead the existence of a "close business relationship" (pursuant to Boyle) between the defendant and the innumerable other members of the alleged association-in-fact simply by performing routine banking services (i.e., processing transactions and allowing access to the ACH Network). Instead, as the court explained in a subsequent order in which it again dismissed identical RICO claims, this relationship was merely a "routine contractual combination to provide financial services" that did not rise to the level of an enterprise-in-fact.[3] See Parm II at 1346.

Parm I's holding is based in large part on In re Ins. Brokerage Antitrust Litig., in which another district court rejected a plaintiff's attempt to plead a sweeping RICO enterprise consisting of insurance carriers and insurance brokers. Nos. 04–5184 (GEB), 05–1079 (GEB), 2007 WL 1062980, at *30 (D.N.J. April 5, 2007). In that case, the plaintiff alleged the existence of a "hub-and-spoke" scheme roughly similar to the one here—that is, a scheme

> in which a central core of conspirators recruits separate groups of co-conspirators to carry out the various functions of the illegal enterprise. In such a conspiracy, the core conspirators are the hub and each group of co-conspirators form a spoke leading out from the center in different directions. The core conspirators move from spoke to spoke, directing the functions of the conspiracy.

United States v. Chandler, 388 F.3d 796, 807 (11th Cir. 2004) (internal citations omitted); see also Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Specifically, the scheme in In re Ins. Brokerage Antitrust Litig. was one by which brokers, along with various groupings of insurers, conspired to produce phony insurance quotes in a system of bid rigging. 2007 WL 1062980, at *18–19. In dismissing the RICO counts brought under this theory, the court explained that the problem was that the plaintiff's pleadings failed to define these associations between brokers and insurers with any particularity so as to bind the scope of the alleged RICO conspiracy. In other words, each of plaintiffs alleged associations-in-fact between brokers and insurers consisted of "a myriad of unspecified insurance earners that 'ha[d]' the ability to be strategic insurance partners and seek to be the strategic partner of the Broker Defendant.'" Id. at *19 (quoting the plaintiff's complaint). The court stressed that

---

**3.** The court dismissed these same claims in both Parm I and Parm II because, following its order in Parm I the court permitted plaintiff to file an amended complaint reinstating the previously-dismissed RICO claims.

[s]uch allegations effectively transform each Broker-centered Enterprise into the sum of the entire national insurance carrier industry and one Broker Defendant[.] . . . Plaintiffs' allegations, if reasonably construed, do not assert a RICO enterprise but merely inform Broker Defendants of the fact that the latter are members of the insurance industry. Without any factual substantiation linking each Broker Defendant to what potentially might be the entire insurance carrier industry, Plaintiffs' self-serving conclusions are unwarranted and would transform RICO into a legal monster the drafters never envisioned. If allegations about connections between "A," "B" and "C" can be allowed to stretch so to encompass the entire alphabet on the grounds that all entries from "D" to "Z" are also alphabetic letters, such allegations would: (1) allow an anomalous scenario under which a handful of industry members accused of wrongdoing and connected amongst themselves by traceable interactions could transfer an entire industry into a RICO enterprise on the basis of a plaintiffs alleged clairvoyance as to the abilities and wishful thinking among all industry members; and (2) effectively eliminate the pleading requirement for all practical purposes of [Federal] Rule 8(a).

Id. (internal citations and quotations omitted). Surveying other cases in which plaintiffs were rebuffed in their attempts to plead similarly vague association-in-fact enterprises, the court further noted: "[p]laintiffs' claims are *per se* deficient if a RICO plaintiff attempts to stretch a handful of actual interactions into an industry-wide RICO enterprise or tries to assert an industry-wide enterprise by pointing to aspirations and abilities of the industry members rather than to concrete facts interlinking the entire industry." Id. at *20 (emphasis added).

Here, as in Parm I and In re Ins. Brokerage Antitrust Litig., the alleged ACH Network enterprise is rendered equally defective by its sheer scope and imprecision. As explained above, this alleged enterprise-in-fact consists of an immensely broad group of actors, including: (1) "Originators" who "initiate[ ] entries into the ACH Network;" (2) ODFIs, a group that includes "all financial institutions participating in the ACH Network that originate ACH entries;" (3) RDFIs, a group that includes "all depository financial institutions participating in the ACH network that receive ACH transaction instructions;" (4) ACH operators, including the Federal Reserve Banks and the Electronic Payments Network; and (5) third party service providers, a group that includes any entities "other than the Originator, ODFI, or RDFI that perform any function" on those parties' behalf. Second Am. Compl. ¶ 104. But of these nearly innumerable participants in the ACH Network, who together constitute much of the nation's banking industry, only Defendant is accused of wrongdoing; in other words, "Plaintiff's allegations, while creative, essentially attempt to recast a contractual relationship as a RICO enterprise." Parm II at 1348 (citing Gomez v. Guthy–Renker, LLC, No. EDCV14-01425JGB(KKx), 2015 WL 4270042, at *11 (C.D. Cal. July 13, 2015) ("The consensus among courts reflects the judgment that the statutory requirements of RICO cannot be circumvented by attempting to characterize a routine contractual relationship for services as an independent enterprise.") (internal quotation and citation omitted)).

As both Parm I and Parm II recognized, a number of other courts have reached this conclusion when presented with similar facts. See, e.g., Chi v. MasterCard Intern., Inc., No. 1:14-CV-614-TWT, 2014 WL 5019917, at *2–3 (N.D. Ga. Oct. 7, 2014) (concluding that plaintiff failed to ade-

quately plead a RICO enterprise-in-fact consisting of MasterCard and a "consumer savings club" where the complaint alleged only that MasterCard processed fraudulent membership charges on behalf of the club); Anctil v. Ally Fin., Inc., 998 F.Supp.2d 127, 141 (S.D.N.Y. 2014), aff'd in part, rev'd in part sub nom. Babb v. Capitalsource, Inc., 588 Fed.Appx. 66 (2d Cir. 2015) (concluding that plaintiff's complaint, which described a association-in-fact enterprise based on defendants' shared use of a digital registration system for mortgages, failed to allege that "[d]efendants, who are all competitors in the mortgage industry, are in fact working together towards a common goal of any kind ... [t]he Complaint merely alleges the roles each entity played in the legitimate mortgage industry, which is most accurately described as parallel activity among competitors—not coordinated activity to jointly achieve a common fraudulent purpose."); Jubelirer v. MasterCard Int'l Inc., 68 F.Supp.2d 1049, 1053 (W.D. Wis. 1999) (rejecting a similar alleged RICO enterprise-in-fact consisting of a bank, MasterCard, and an online casino—the former two of whom were alleged to have financed the plaintiff's illegal gambling— and explaining that "the law is clear that merely having a business relationship with and performing services for such an [RICO] enterprise, including financial, accounting and legal services, does not support RICO liability because performance of such services is not the equivalent of participation in the operation and management of the enterprise."); see also VanDenBroeck v. CommonPoint Mortg., 210 F.3d 696, 699–700 (6th Cir. 2000), abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co., 553 U.S. 639, 646, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008) (rejecting a similarly diffuse alleged enterprise-in-fact between a single mortgage lender and numerous secondary lenders, and affirming the district court's conclusion that the plaintiff failed to show "any type of mechanism by which this 'group' ... conducted its affairs or made decisions).

Plaintiff maintains that Parm I was wrongly decided, and that the court's inquiry should have ended when it concluded that plaintiff's allegations met the requirements of Boyle.[4] Pl.'s Opp'n to Def.'s Mot. to Dismiss [Doc. 67] ("Pl.'s Opp'n") at 8–9; see Parm I, 2015 WL 11605748, at *20, 22. In support of this argument, Plaintiff relies in part on the Third Circuit's opinion in In re Ins. Brokerage Antitrust Litig., in which it affirmed the lower court's dismissal of the RICO claims discussed above. 618 F.3d 300, 374–75 (3rd Cir. 2010). The court explained in relevant part:

---

4. Defendant correctly notes that the Parm I court concluded that "Plaintiff's allegations satisfy the minimum standards set for by the Supreme Court in Boyle." Parm I, 2015 WL 11605748, at *20. Later in the same order, however, the court seemed to reconsider this conclusion, observing:

> On the one hand, the alleged ACH Network Enterprise appears to satisfy the minimum requirements outlined in Boyle for pleading an enterprise's structure. On the other hand, the purported ACH Network Enterprise comprises not only the entire banking industry as well as the Federal Reserve banks but also an untold and unidentifiable number of merchants who seek to process transactions through the ACH Network. Moreover, the Eleventh Circuit, which in the past has articulated an easy to meet standard for establishing a RICO enterprise, has not provided any guidance on how the Supreme Court's decision in Boyle should affect that standard.

Id. at *22 (emphasis added). Given this subsequent passage in Parm I (as well as the court's reaffirmation of its dismissal of this count in Parm II), it appears to the Court that Parm I implicitly concluded that the enterprise at issue failed to conform with Boyle's minimum structural requirements.

Even under the relatively undemanding standard of Boyle, these allegations do not adequately plead an association-in-fact enterprise. They fail the basic requirement that the components function as a unit, that they be "put together to form a whole." Because plaintiffs' factual allegations do not plausibly imply anything more than parallel conduct by the insurers, they cannot support the inference that the insurers "associated together for a common purpose of engaging in a course of conduct." Were the rule otherwise, competitors who independently engaged in similar types of transactions with the same firm could be considered associates in a common enterprise. Such a result would contravene Boyle's definition of "enterprise."

Id. (internal citations omitted) (emphasis added).

Plaintiff now argues cursorily that the ACH Network "provides the structure and organization" the Third Circuit found lacking in In re Ins. Brokerage Antitrust Litig., and thus strains to distinguish this case from several others in which courts have reached the opposite result, including Chi, Anctil, and Jubelirer as well as the Eleventh Circuit's more recent decision in Almanza. Specifically, Plaintiff maintains that, contrary to the defendants in those above-cited cases, participants in the ACH Network are part of a "structured system" whose members must "rely on each other to accomplish their shared purpose and comply with the network's rules"—and that the ACH Network, contrary to these other "enterprises," meets Boyle's structural requirements. Pl.'s Opp'n at 9–15. But this is a distinction without a difference: although participants in the ACH Network may share the "common lawful and legitimate purpose of facilitating batch processing of electronic payments," id. at 11 (quoting Second Am. Compl. ¶ 105), Plaintiff's allegations still amount to the hazy claim that, simply by virtue of partici-

pating in a sprawling, nationwide system of payment processing, countless actors around the country also took part in a RICO conspiracy. At their core, these activities are no different from those that made up the broker-insurer combinations at issue in In re Ins. Brokerage Antitrust Litig., the electronic mortgage system at issue in Anctil, or the MasterCard payment system at issue in Jubelirer. As other courts have recognized, Count One's theory of enterprise-in-fact liability is an attempt to fit a square peg in a round hole.

Because Plaintiff cannot escape the fact that its alleged enterprise-in-fact amounts to treating "a nationwide industry [as] a RICO enterprise" that includes "an infinite number of unidentified and potentially unidentifiable entities," Parm I 2015 WL 11605748, at *21 (quoting Brokerage Antitrust, 2007 WL 1062980, at * 19, 21), Count One fails to state a claim upon which relief can be granted.

Defendant's Motion to Dismiss is **GRANTED** with respect to Count One of the Second Amended Complaint.

### 2. Plaintiff's Alternative Alleged RICO Enterprise (Count Two)

■ As an alternative to Count One, Plaintiff pleads a narrower association-in-fact enterprise consisting only of Defendant and First International. Second Am. Compl. ¶¶ 115–30. According to this alternative enterprise theory, Plaintiff alleges that Defendant and First International "associated together to use their respective roles in the ACH Network for the common purpose of profiting through the collection of unlawful debt," and that, in furtherance of this scheme, Defendant entered into origination agreements with First International, thereby using its role as a "gatekeeper" in the ACH Network to permit unlawful debit entries initiated by First International. Id. ¶¶ 117–21. Plaintiff alleges that Defendant and First Interna-

tional constituted an enterprise-in-fact—or what Plaintiff deems the "Unlawful Debt Collection Enterprise"—because they (1) "share the common unlawful purpose of using their respective roles in the ACH Network to profit through the collection of unlawful debt;" (2) "preserve a close business relationship and maintain established and defined roles within the enterprise;" and (3) have associated together for a "sufficient period" to achieve their common purpose, collecting "millions of dollars" by doing so. Id. ¶ 125. Plaintiff also reiterates her allegation that Defendant plays a "distinct role" in operating, managing, and controlling the ACH network, including the "critical function of 'gatekeeper of the ACH Network,' " and that Defendant uses this gatekeeping role to collect unlawful debt by granting illegal payday lenders like First International access to the ACH Network. Id. ¶¶ 105, 110.

■ To be liable under the RICO statute, a defendant must "conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs." 18 U.S.C. § 1962(c). The Supreme Court has explained that, in this context, "participation" means that one had "some part in directing [the enterprise's] affairs"—and "not just [its] *own* affairs." Reves v. Ernst & Young, 507 U.S. 170, 179, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (emphasis in original). Thus, although RICO liability "is not limited to those with primary responsibility for the enterprise's affairs," 18 U.S.C. § 1962(c) nevertheless requires that one actually "participate[ ] in the operation or management of the enterprise itself." Id. at 179, 183, 113 S.Ct. 1163.

As explained above, the Second Amended Complaint alleges that Defendant and First International entered into origination agreements according to which Defendant agreed to "initiate" debits "at the request of" First International for a fee, and that Defendant knew First International was engaged in illegal payday lending. Second Am. Compl. ¶¶ 117–23. But while the Complaint alleges that Defendant and First International "associated together," had a "close business relationship," and that Defendant played a "distinct role" in the "operation, management, and control" of their shared enterprise, it makes no specific allegations concerning any association, communication, or collaboration between the two that would suggest they in fact had a "business relationship." Id. ¶¶ 119, 127. Pointing to the absence of these specific allegations, Defendant maintains that, to the extent its "direction" of the RICO enterprise is reducible to the mere processing of debits on behalf of First International, Plaintiffs alleged enterprise-in-fact must fail as a matter of law. See Def.'s Mem. at 13–14.

The Court agrees that Plaintiff has again failed to plead sufficient facts to establish a RICO enterprise-in-fact under this alternative theory. In Chi, the Northern District of Georgia dismissed a RICO claim closely analogous to the one made here. 2014 WL 5019917, at *1. In that case, the plaintiffs sued MasterCard for processing transactions initiated by a third-party merchant—transactions that MasterCard *knew* to be fraudulent—on the theory that the arrangement between MasterCard and the merchant constituted a RICO enterprise. Id. But the court rejected plaintiffs' RICO claims, concluding that, based on the facts pleaded in the complaint, MasterCard had no plausible role in "directing" the enterprise's affairs. Id. at *2. The court explained that, while MasterCard was alleged to have knowingly processed fraudulent charges, the complaint failed to allege any agreement between the parties, much less "any facts that suggest MasterCard did anything other than act as a credit card company in the normal course of business"—a result consistent with other courts' holdings that "where credit card companies are carrying out their business

of processing transactions, they are not participating in a RICO enterprise." Id. (citing In re Trilegiant Corp., 11 F.Supp.3d 82, 99–100 (D. Conn. 2014); In re Master-Card Int'l, Inc., Internet Gambling Litig., 132 F.Supp.2d 468, 486–87 (E.D. La. 2001)); see also Jubelirer, 68 F.Supp.2d at 1054 (concluding, under a similar set of facts, that "[a]ccepting plaintiff's allegations as sufficient to allege a RICO enterprise would lead to the absurd conclusion that each of the many million combinations of merchant, MasterCard and lender is a RICO enterprise.").

Defendant is a bank, not a credit card company. But in all other respects, the facts here are almost indistinguishable from those in Chi and the cases on which it relies. Although Plaintiff attempts to portray Defendant and First International as co-conspirators in its so-called "Unlawful Debt Collection Enterprise"—an enterprise Defendant is further alleged to have played a "distinct role" in operating, managing, and controlling—the Second Amended Complaint fails to allege any concrete instances of communication or collaboration, much less interaction, between the two, or to otherwise substantiate the claim that they had any kind of "business relationship." Indeed, while the Second Amended Complaint alleges that De-fendant agreed to "originate" entries on behalf of First International "despite knowing the unlawful nature of First International's business," Second Am. Compl. ¶ 121, it fails to specifically allege that Defendant actually had an origination agreement with First International or whether, in the alternative, the debits at issue were sent through a third-party sender. See id. ¶¶ 81–82 (stating that "[w]hether ODFIs contract with Illegal Payday Lenders or their Third–Party Senders, ACH debits originated at the request of Illegal Payday Lenders inevitably raise 'red flags[.]' "). In other words, Plaintiff fails to distinguish how this alleged contractual arrangement is any different from or less routine than, for instance, a credit card company's processing of transactions, even those it knows to be fraudulent. See, e.g., United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co., 719 F.3d 849, 854–55 (7th Cir. 2013) (dismissing plaintiff's RICO claim where "nothing in the complaint reveal[ed] how one might infer" that the interactions between the parties comprising an alleged enterprise-in-fact "were undertaken on behalf of the *enterprise* as opposed to on behalf of [the parties'] individual capacities, to advance their individual self-interest.") (emphasis in original).[5]

---

5. Pointing to the Eleventh Circuit's holding that "one may be liable under the operation or management test by 'knowingly implementing decisions, as well as by making them [on behalf on an alleged enterprise],' " U.S. v. Starrett, 55 F.3d 1525, 1548 (11th Cir. 1995) (quoting U.S. v. Oreto, 37 F.3d 739, 750 (1st Cir. 1994)), Plaintiff maintains that Defendant "operated and managed the [alleged enterprise in fact] by implementing First International's decision to debit borrowers' accounts." Pl.'s Opp'n at 19–20. But Plaintiff reads Starrett's holding too broadly. In that case, the court's finding that defendants satisfied Reves' operation or management test was based not only on the fact that the defendants "knowingly implement[ed]" the decision to murder witnesses on behalf of a larger criminal enterprise, but also on the fact that they (1) assumed some part in "directing" the affairs of the enterprise by "permanently silencing" the murdered witnesses, and (2) engaged in other criminal conduct as part of the alleged enterprise sufficient to show that none stood "so low on the [enterprise's] ladder that they should be excluded from RICO liability." Starrett, 55 F.3d at 1548. As already explained above, Plaintiff has at most alleged here that Defendant "carried out the payday lenders' directives, in accordance with a business relationship," Parm II at 1349, and has otherwise failed to allege that Defendant engaged in any conduct *on behalf of the enterprise itself.*

In its response, Plaintiff points to one district court's conclusion, under a similar set of facts, that the plaintiff adequately pleaded a RICO enterprise consisting of participants in the ACH Network who were alleged to have processed false transactions on behalf of a fraudulent telemarketing scheme. Pl.'s Opp'n at 18–19 (citing Reyes v. Zion First Nat'l Bank, No. 10-345, 2012 WL 947139 (E.D. Pa. Mar. 21, 2012)). Reyes shares a number of similarities with the present case, including the fact that one of its defendants, a bank, processed debits the bank allegedly knew or should have known to be fraudulent. Id. at *6. But a crucial distinction between Reyes and the present case is that, in Reyes, the alleged enterprise-in-fact [6] consisted of an association between a bank and a *payment processor*, both of which the court concluded "serve[d] independent and crucial roles in conducting an enterprise with the common purpose of earning fees for facilitating fraudulent telemarketing schemes." Id. at *6. Most importantly, the two defendants in Reyes were alleged, among other things, to have "discussed the high rates of return" they received by processing fraudulent telemarketing transactions, and one of the defendants "communicated frequently with the allegedly fraudulent telemarketers [whose debits the defendant bank processed] about their return rates." Id. Plaintiff makes no similar allegations of communication or collaboration, and thus some "direction" of the enterprise, between Defendant and First International.

Plaintiff also submits another, recently-decided case by the Tenth Circuit, George v. Urban Settlement Servs., that she maintains supports her claim that Defendant "directed" the alleged enterprise within the meaning of Reyes. 833 F.3d 1242 (10th Cir. 2016); see Pl.'s Notice of Suppl. Au-

thority [Doc. 53] ("Pl.'s First Notice"). Plaintiff cites George primarily for its holding that "a plaintiff can easily satisfy Reyes' operation and management test by showing that an enterprise-in-fact's member played some part—even a bit part—in conducting the enterprise's affairs," and thus argues that Defendant's processing of debits for First International meets this low bar. Pl.'s First Notice at 2 (citing George, 833 F.3d at 1252). However, Plaintiff ignores the context underlying the Tenth Circuit's holding. George ultimately concluded that the defendant in that case "further[ed] the enterprise's goals" because it undertook a wide variety of tasks in furtherance of the enterprise's goals, including creating internal systems for receiving and processing borrower documents, communicating with borrowers, and steering borrowers towards certain loan modification programs. Id. at 1253. As already explained above, the Second Amended Complaint in this case lacks any allegations that the parties had a similar relationship, much less any relationship, characteristic of an "enterprise" as opposed to a routine business relationship.

Accordingly, Defendant's Motion to Dismiss is GRANTED with respect to Count Two of the Amended Complaint.

### 3. Plaintiff's Remaining RICO Claims (Counts Three & Four)

Plaintiff brings two additional RICO counts based on the allegation that Defendant participated in a conspiracy to collect unlawful debts in violation of 18 U.S.C. § 1962(d), which makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)[.]" 18 U.S.C. § 1962(d); Second Am. Compl. ¶¶ 131–40. Count Three is based on the same operative facts as Count One; Count

---

**6.** Although a number of different RICO enterprises were alleged in Reyes, only the one

discussed here is relevant for purposes of comparison.

Four is based on the same operative facts as Count Two.

■ "Although a defendant can be held liable for a conspiracy even if it is not liable for the underlying offense, 'what is required to support a claim of RICO conspiracy is that plaintiffs allege an illegal agreement to violate a substantive provision of the RICO statute.'" Fuller v. Home Depot Servs., LLC, 512 F.Supp.2d 1289, 1295–96 (N.D. Ga. 2007) (quoting Jackson v. BellSouth, 372 F.3d 1250, 1269 (11th Cir. 2004)). However,

> [t]o sufficiently state a conspiracy claim, ... the complaint must allege the existence of an agreement to commit an act that is itself illegal—parties cannot be found guilty of conspiring to commit an act that is not itself against the law ... If the underlying allegations of RICO violations are not viable, a conspiracy claim based on those violations must also fail.

Id. (internal quotations and citation omitted).

Because Plaintiff has failed to plead facts that would establish a violation of Section 1962(c) under either theory discussed above, she cannot state a claim for conspiracy under Section 1962(d) based on those same underlying alleged RICO violations. See, e.g., Fuller, 512 F.Supp.2d at 1295–96; United Food, 719 F.3d at 856–57 ("[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute.") (internal quotations and citation omitted).

Defendant's Motion to Dismiss is therefore **GRANTED** with respect to Counts Three and Four of the Second Amended Complaint.

## C. Plaintiff Has Failed to Sufficiently Allege Claims Under State Law

### 1. Unjust Enrichment (Count Five)

Count Five of the Second Amended Complaint alleges that Defendant was unjustly enriched by its illegal origination of debit entries on the ACH Network. Second Am. Compl. ¶¶ 142–49. However, Plaintiff states that it has voluntarily withdrawn this claim. See Pl.'s Opp'n at 25. Accordingly, Count Five of the Second Amended Complaint is **DISMISSED**.

### 2. Aiding and Abetting Violations of the Georgia Payday Lender Act (Count Six)

■ Finally, Plaintiff argues that Defendant violated Georgia's Payday Lending Act ("GPLA"), O.C.G.A. § 16–17–1 et seq. (2015), which makes it unlawful "to engage in any business, in whatever form transacted, including, but not limited to by mail, electronic means, the Internet, or telephonic means, which consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00[.]" O.C.G.A. § 16–17–2(a). Plaintiff's claim is based on O.C.G.A. §§ 16–17–2(d) and 16–17–4. O.C.G.A. § 16–17–2(d) provides:

> [a]ny person who violates subsection (a) or (b) of this Code section shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both.... Any person who aids or abets such a violation, including any arbiter or arbitration company, shall likewise be guilty of a misdemeanor of a high and aggravated nature and shall be punished as set forth in this subsection.

Id. (emphasis added). O.C.G.A. § 16–17–4 provides:

(a) Any person who violates subsection (a) or (b) of Code Section 16–17–2 shall be liable to the state for a civil penalty equal to three times the amount of any interest or charges to the borrowers in the unlawful transactions.

(b) A civil action under Code Section 16–17–2 may be brought by the Attorney General, any district attorney, or a private party. Where a successful civil action is brought by a district attorney, one-half of the damages recovered on behalf of the state shall be distributed to the office of the district attorney of the judicial circuit of such district attorney to be used by the district attorney in order to fund the budget of that office.

Id. (emphasis added). In light of the foregoing, Plaintiff alleges (1) that the illegal payday loans made to Plaintiff in Georgia fell within the scope O.C.G.A. § 16–17–2(a) because they were for a principal amount of less than $3,000.00 and did not fall within any other statutory exemption; and (2) that Defendant therefore aided and abetted illegal payday lenders' violation of O.C.G.A. § 16–17–2(a) by providing them with access to the ACH Network, despite knowing that the lenders' activities were illegal. Second Am. Compl. ¶¶ 152–55.

Defendant contends that no civil cause of action for an aiding and abetting violation of the GPLA exists under O.C.G.A. § 16–17–4(b). Specifically, Defendant argues that, because the GPLA's aiding and abetting provision, O.C.G.A. § 16–17–2(d), states that aiders and abettors "shall be punished as set forth in this subsection," and because the only available remedies in the subsection are criminal, the Court should decline to imply a private cause of action for aiding and abetting from the broader language found in O.C.G.A. § 16–17–4(b). Def.'s Mem. at 23 (quoting O.C.G.A. § 16–17–2(d)). Plaintiff responds that the plain language of O.C.G.A. § 16–17–4(b)—pursuant to which "[a] civil action under Code Section 16–17–2 may be brought by ... a private party"—should control. Pl.'s Opp'n at 24.

Faced with similar arguments from the parties, the court in Parm II concluded that O.C.G.A. § 16–17–4(b) does not create a private cause of action for an aiding and abetting violation of the GPLA. The Court finds the following discussion persuasive:

[T]he Court finds that the [GPLA] does not create a private right of action for aiding and abetting a violation of the Act. O.C.G.A. § 16–17–3 and O.C.G.A. § 16–17–4, which confer a private right of action, provide remedies against "a person who violates" and a "person violating" O.C.G.A. § 16–17–2(a) or (b). Those provisions do not refer to an aider and abettor. The General Assembly knew how to impose liability for aiding and abetting when it chose to do so, and if it had intended to do so here, presumably it would have used those words in the statutory text. See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 176–77 [114 S.Ct. 1439, 128 L.Ed.2d 119] (1994) (noting that "Congress knew how to impose aiding and abetting liability when it chose to do so," and stating that, if "Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not"). The fact that the General Assembly did not do so is a strong indication that the statutory scheme does not create a private right of action against an aider and abettor.

Indeed, the Act as a whole demonstrates that the General Assembly knew how to reach aiders and abettors, as it imposed criminal liability against those individuals in O.C.G.A. § 16–17–2(d). The General Assembly also knew how to create a private right of action, as it created such a right of action against direct violators

in O.C.G.A. §§ 16–17–3 and 16–17–4. When interpreting the Act, the Court must presume that the General Assembly's failure to expressly provide for a private right of action for damages against aiders and abettors, while providing such a right against primary violators, was a deliberate choice. The absence of such a provision supports a determination that the General Assembly did not intend to provide a private civil right of action for aiding and abetting violations of the Act. The fact that O.C.G.A. § 16–17–2(d) imposes criminal liability on aiders and abettors does not warrant a different conclusion. As previously discussed, the Georgia Courts are extremely reluctant to impute private, civil rights of action from criminal statutes, and the Court sees no reason to depart from this rule.

The Court also declines to use the common law civil tort doctrine of aiding and abetting to extend civil liability to aiders and abettors under the Act. Nothing in the language of the Act indicates that it is intended to provide for aiding and abetting liability, and the Court will not put into the Act a provision that the "General Assembly left out of it and the Georgia courts have not read into it." Chepstow Ltd. v. Hunt, 381 F.3d 1077, 1089 (11th Cir. 2004); see also id. at 1088–89 (finding that Georgia's Uniform Fraudulent Transfers Act did not provide for aiding and abetting liability). Moreover, "it is worth noting that the General Assembly appears to be so concerned about the judicial creation of implied civil causes of action that it recently enacted O.C.G.A. § 9–2–8(a), which states that '[n]o private right of action shall arise from any Act enacted after the effective date of this Code section

unless such right is expressly provided therein.'" Anthony v. Am. Gen. Fin. Serv., Inc., 287 Ga. 448, 445 [459, 697 S.E.2d 166] (2010) (quoting O.C.G.A. § 9–2–8(a)). Although O.C.G.A. § 9–2–8(a), which was enacted in 2010, would not apply to the pre-existing Act, "it certainly counsels against deviating from the Georgia Supreme Court's established precedent to find new implied civil causes of action." Id.

Plaintiff's arguments would require the Court to ignore the established rules of statutory construction and add terms to the statute that the General Assembly apparently never intended to include in the statutory scheme. The Court finds that reading a private civil right of action against aiders and abettors into the Act is inappropriate, and declines to do so here.

Parm II at 1340–41. Plaintiff makes no attempt to dispute the above reasoning.

In light of the foregoing, the Court concludes that no civil aiding and abetting claim exists under the GPLA. Defendant's Motion to Dismiss is accordingly **GRANTED** with respect to Count Six of the Amended Complaint.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant First Premier Bank's Motion to Dismiss [Doc. 65] is **GRANTED.**[7]

The Clerk is **DIRECTED** to close this case.

**IT IS SO ORDERED** this 7th day of June, 2017.

---

**7.** By virtue of the Court's ruling, Defendant's Motion to Continue Certain Preliminary Deadlines [Doc. 66] is **DENIED AS MOOT**.